## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

LIANA SEXTON,

                Plaintiff,

     v.

COMMUNITY LIFE TEAM, INC.,

                Defendant.

CIVIL ACTION NO. 1:22-CV-02018

(MEHALCHICK, J.)

### MEMORANDUM

This action was commenced upon the filing of a complaint by Plaintiff Liana Sexton ("Sexton") against Defendant Community Life Team, Inc. ("Community Life Team") on December 2, 2022. (Doc. 1). Plaintiff filed the amended complaint ("Amended Complaint") asserting claims pursuant to Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et. seq., the Pennsylvania Human Relations Act ("PHRA"), and the Family & Medical Leave Act ("FMLA"), 29 U.S.C. §§2601 et. seq., arising from Sexton's employment with Community Life Team, and her subsequent termination. (Doc. 35). Before the Court is a motion for summary judgment filed by Community Life Team. (Doc. 37). For the following reasons, the motion for summary judgment will be **DENIED.**

### I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant factual background to the motion for summary judgment is as follows.[1] Community Life Team is a provider of emergency medical services. (Doc. 39, ¶ 1). On August 19, 2019, Sexton began working the night shift as a dispatcher of emergency medical

---

[1] This factual summary is taken from the parties' statements of material facts, supporting exhibits, and briefs. (Doc. 38; Doc. 39; Doc. 40-1; Doc. 40-2; Doc. 40-3; Doc. 40-4; Doc. 40-5; Doc. 40-6; Doc. 40-7; Doc. 40-8; Doc. 40-9; Doc. 40-10; Doc. 40-11; Doc. 42; Doc. 42-1; Doc. 42-2; Doc. 42-4; Doc. 47; Doc. 48; Doc. 49; Doc. 50-1).

technicians and paramedics based out of Community Life Team's York, Pennsylvania office. (Doc. 39, ¶¶ 1, 17-18). In July 2020, Sexton applied for and was hired by Business Manager Debra Messick ("Messick") as an account representative for Community Life Team, again in the York office. (Doc. 39, ¶¶ 10, 20-22).

Account representatives perform quality assurance and billing work. (Doc. 39, ¶ 26; Doc. 40-5, at 7). When Sexton was hired, account representatives did not perform both types of work. (Doc. 39, ¶ 34; Doc. 42-2, ¶ 34; Doc. 40-5, at 7). Instead, the work was bifurcated, with some account representatives performing billing and some performing quality assurance. (Doc. 39, ¶ 34; Doc. 42-2, ¶ 34; Doc. 40-5, at 7-8). Sexton was trained to and performed quality assurance work, which included making sure chart information is accurate before it is billed. (Doc. 29, ¶¶ 27-29; Doc. 42-2, ¶¶ 27-29). At some point during Sexton's employment as an account representative, Community Life Team altered the job functions of account representatives so that each account representative would perform both qualify assurance and related billing work. (Doc. 40-5, at 7-9). This was done in an effort to cut costs and improve efficiency. (Doc. 40-5, at 7-9). Someone only performing quality assurance would require additional training to learn how to do billing. (Doc. 29, ¶ 39; Doc. 42-2, ¶ 39; Doc. 40-5, at 7). Initially, Messick told Sexton that such training would require Sexton to be in-person for training two days per week. (Doc. 42-4, at 472).

From December 21, 2020 through January 2022, Sexton worked remotely due to COVID-19. (Doc. 40-2, at 5). While she was working remotely, in September 2021, Community Life Team  announced that account representatives' offices would be relocated from the company's York office to its Harrisburg office. (Doc. 40-1, at 14-15). Messick told

Sexton that she would be able to continue working remotely indefinitely, so she did not have to relocate to Harrisburg or request a transfer. (Doc. 40-1, at 15).

Sexton has suffered from seizures since 2009 as a result of catamenial epilepsy, and despite treatment, still had breakthrough seizures. (Doc. 40-1, at 3; Doc. 42-1, ¶¶ 27-28; Doc. 49, at 16-17). On July 8, 2020, Sexton suffered from a seizure at the workplace. (Doc. 42-1, ¶ 31; Doc. 42-4, at 229). Messick discovered Sexton in the bathroom. (Doc. 42-1, ¶ 31; Doc. 42-4, at 229). After this 2020 seizure, Sexton pursued and was granted by Defendant FMLA leave intermittently for "incapacity," which according to Sexton, included doctor appointments and recovery from seizures as needed. (Doc. 42-1, ¶ 33; Doc. 49, at 19).

On January 17, 2022, while working remotely, Sexton experienced a severe breakthrough seizure, affecting her ability to stand, sit, drive, move her whole left leg, and do other daily tasks. (Doc. 40-1, at 3-4; Doc. 42-1, ¶ 39; Doc. 49, at 21, 26-27). Sexton received short-term disability benefits and FMLA leave. (Dox. 42-1, at 9-12; Doc. 49, at 23). On Sexton's first short-term disability request form, her physician, Dr. Delp, attested that Sexton was unable to return to work and would be reevaluated on February 22, 2022. (Doc. 39, ¶ 79; Doc. 42-2, ¶ 79). On that date, Dr. Delp delayed Sexton's return to work date to May. (Doc. 42-1, ¶ 43; Doc. 42-4, at 313-318; Doc. 49, at 23).   In May, Sexton's physical therapist determined that she could still not return to work, and estimated another eight weeks of recovery time. (Doc. 42-1, ¶ 56; Doc. 42-4, at 414-417; Doc. 49, at 31).

Throughout Sexton's recovery, Messick communicated to Sexton that the training for billing work would require her to be in-person five days a week for three to six months. (Doc. 40-1, at 14). This contradicted Messick's earlier statement to Sexton that the training would require only two days in-person per week. (Doc. 42-4, at 472). Sexton was also aware of at

least one other employee who was required to only receive two days of in-person training. (Doc. 42-1, ¶ 84; Doc. 42-4, at 451-453).

While Sexton was on paid leave, she corresponded with WorkPartners, a third-party company that handles Defendant's FMLA leave requests. (Doc. 42-1, ¶¶ 34, 40-50; Doc. 49, at 21-27). On April 25, 2022, Sexton submitted her Accommodation Request Form, which requested remote work. (Doc. 42-1, ¶ 50, Doc. 42-4, at 400-402; Doc. 49, at 27). On June 14, 2022, Dr. Delp completed official visit documentation, in which he noted that he told Sexton he was supportive of her returning to work remotely and would work with Sexton and Community Life Team to provide documentation. (Doc. 42-1, ¶ 67; Doc. 42-4, at 427-428; Doc. 49, at 36-37). Community Life Team, through Messick, repeatedly denied Sexton's requests to work remotely, citing the billing training and duties that required in-person work. (Doc. 42-1, ¶ 71; Doc. 49, at 40). On July 8, 2022, Sexton spoke with WorkPartners and reported that Dr. Delp estimated a return to work in-person date of September 30, 2022. (Doc. 42-1, ¶ 71; Doc. 49, at 40). Community Life Team terminated Plaintiff's employment, effective on July 8, 2022, shortly before her short-term disability benefits were set to expire on July 18, 2022. (Doc. 42-1, ¶¶ 73-74; Doc. 49, at 40-41).

On December 2, 2022, Sexton initiated this action by filing a complaint against Community Life Team. (Doc. 1). On September 18, 2023, Sexton filed the Amended Complaint against Community Life Team alleging the following claims: Count I – Violations of the ADA for retaliation, disability discrimination, and failure to accommodate; Count II – Violations of FMLA for retaliation; and Count III – Violations of the PHRA for retaliation, disability discrimination, and failure to accommodate. (Doc. 35, at 6-8).  On November 3, 2023, Community Life Team filed its Answer to the Amended Complaint. (Doc. 336). On

November 30, 2023, Community Life Team filed a motion for summary judgment and a brief in support, as well as a statement of facts and exhibits. (Doc. 37; Doc. 38; Doc. 39; Doc. 40). On December 21, 2023, Sexton filed a brief in opposition, a counterstatement of facts, a response to Community Life Team's statement of facts, and exhibits. (Doc. 42; Doc. 42-2; Doc. 42-2; Doc. 42-3; Doc. 42-4). On January 12, 2024, Community Life Team filed a reply brief and a response to Sexton's counter statement of facts. (Doc. 47; Doc. 48). Accordingly, the matter is now ripe for disposition.

## II.   LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility

determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson, 477 U.S. at 249.*

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*. If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Fed. R. Civ. P. 56(c)*; *Celotex, 477 U.S. at 324*. The non-movant must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323*. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)*; *see also Thomas v. Delaware State Univ., 626 F. App'x 384, 389 n.6 (3d Cir. 2015)* (not precedential).

## III.  DISCUSSION

Sexton Sexton alleges several violations of the ADA and PHRA,[2] including disability discrimination, failure to accommodate, and retaliation. (Doc. 35). In order for a plaintiff to

---

[2] In general, "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("Pennsylvania courts ... generally interpret the PHRA in accord with its federal counterparts....")). Because these two statutes are generally coextensive, the Court

establish a *prima facie* case of discrimination under the ADA, the plaintiff must show: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir. 1998) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)).[3]

A.   SEXTON'S ADA CLAIMS OF DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE

**1.   Qualified Individual**

Community Life Team first argues that it is entitled to summary judgment on Sexton's disability discrimination claim because Sexton was not an "otherwise qualified" individual under the ADA. (Doc. 38, at 10). Sexton responds that Community Life Team's refusal to allow Sexton to work remotely after her seizure, despite offering remote work before her seizure, supports the inference of discrimination. (Doc. 42, at 22).

Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the

---

will address the merits of each claim solely under the ADA. *See Taylor*, 184 F.3d at 306; *Kelly*, 94 F.3d at 105.

[3] In the case at bar, Community Life Team does not dispute that Sexton was an individual with a disability as defined by the ADA. (Doc. 38, at 10, 22-23). Further, neither party disputes that termination is an adverse employment action.

essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002) ("The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position.") (citing 9 C.F.R. § 1630.2(m)). The focus of this inquiry is not whether an employee can perform all aspects of the job, but essential ones. *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 147 (3d Cir. 1998) ("Congress explained that the Act focused on an individual's ability to perform 'essential functions' to ensure that persons with disabilities 'not be disqualified because of the inability to perform non-essential or marginal functions of the job.'") (quoting House Judiciary Report at 31–32, reprinted in 1990 U.S.C.C.A.N. at 454). Whether a function is "essential" is a factual determination. *See Deane*, 142 F.3d at 148 (whether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'") (quoting 29 C.F.R. pt. 1630, app. § 1630.2(n)). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Community Life Team asserts that Sexton was not a qualified individual under the ADA because she was not trained to do billing work. (Doc. 38, at 16). According to

Community Life Team, billing work is a prerequisite and an essential function of Sexton's job. (Doc. 38, at 16). As such, when Sexton could not come in-person to receive the requisite training, she was no longer qualified for her position. (Doc. 38, at 16). Sexton refutes this conclusion, pointing to evidence that she received positive performance reviews both while working in-person and remotely and that she was permitted to indefinitely work from home prior to her January 2022 seizure. (Doc. 42, at 14; Doc. 40-2, at 5; Doc. 42-4, at 226). Messick's deposition testimony also establishes that Community Life Team trained account representatives to do billing work on a staggered basis, reflecting that not all account representatives did identical work. (Doc. 42-4, at 119). The record also contains evidence that not all account representatives came to the office every day, and as of April 2023, some account representatives still worked in a hybrid fashion. (Doc. 42-4, at 107). Given the evidence in the record, the Court finds that a genuine issue of material fact exists as to whether working in-person every day and receiving billing training in-person was an "essential" duty, and a reasonable juror could conclude that Sexton was otherwise qualified to perform the essential functions of her former job. *See Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000).

## 2. Legitimate Non-Discriminatory Reasons

Federal courts apply the *McDonnell Douglas* burden-shifting framework to assess ADA disparate treatment claims. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate nondiscriminatory reason" for the alleged discriminatory action. *McDonnell Douglas*, 411 U.S. at 802. Community Life Team asserts that, even if Sexton was otherwise

qualified for her job, her discrimination claim still fails because it had legitimate, non-discriminatory reasons for firing her. (Doc. 38, at 16-17). Community Life Team argues that the expiration of Sexton's FMLA leave coupled with the lack of a return date prompted the firing, not her disability. (Doc. 38, at 16-17). However, according to evidence in the record, Community Life Team fired Sexton *before* her FMLA leave expired. (Doc. 42-1, ¶¶ 73-74; Doc. 49, at 40-41). The record also reflects that Messick was unhappy with Sexton's FMLA leave, stating she had "no words" for Sexton's continued absence. (Doc. 42, at 23; Doc. 42-4, at 411). Given the evidence in the record and the disputed issues of fact as to why Community Life Team terminated Sexton, the Court finds that a reasonable juror could conclude that Community Life Team did not have a legitimate reason for firing Sexton.

### 3. Sexton's Failure to Accommodate Claim

As to Sexton's failure to accommodate claim, Community Life Team submits that it is entitled to summary judgment because its refusal to grant Sexton's request to work from home or receive additional leave was not a violation of the ADA. (Doc. 38, at 22).

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Specifically, the ADA construes "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity...." 42 U.S.C. § 12112(b)(5)(A). In order to establish a *prima facie* claim for failure to accommodate under the ADA, a plaintiff must prove:

"(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination[,] which in this context includes refusing to make reasonable accommodations for a plaintiff's disabilities." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009) (quotations omitted).

"In handling a disabled employee's request for a reasonable accommodation, 'both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'" *Hohider*, 574 F.3d at 187 (quoting *Taylor*, 184 F.3d at 312). The plaintiff bears the initial burden of identifying a possible accommodation and showing that the cost of the accommodation does not clearly exceed its benefits. *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 284 (3d Cir. 2001); *Gaul*, 134 F.3d at 580–81; *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 431 (E.D. Pa. 2012); *O'Donnell v. Pennsylvania Dep't of Corr.*, 790 F. Supp. 2d 289, 301 (M.D. Pa. 2011), *aff'd*, 507 Fed.Appx. 123 (3d Cir. 2012) (not precedential). Thus, "district courts [may] grant summary judgments for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly." *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)). In other words, an employer that refuses to reasonably accommodate a plaintiff's disability violates the ADA unless "the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]," *Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 761 (3d Cir. 2004) (internal quotations and citations omitted). The reasonableness of an accommodation is usually a question of fact. *See Buskirk*, 307 F.3d at

170 ("Generally, the question of whether a proposed accommodation is reasonable is a question of fact.")

Again, Community Life Team does not dispute that Sexton was an individual with a disability under the ADA. (Doc. 38, at 10, 22-23). Further, as discussed *supra*, this Court has determined that there is at least a "genuine dispute" as to whether Sexton was "otherwise qualified" for her position. Fed. R. Civ. P. 56(a). Assuming Sexton was otherwise qualified, her failure-to-accommodate claim then turns on the third element: whether Community Life Team refused to make reasonable accommodations. *See Hohider*, 574 F.3d at 186.

The Court finds that the record reflects that Sexton has raised genuine issues of material fact in the record as to whether remote work was a reasonable accommodation. (Doc. 42-1, ¶¶ 50, 67; Doc. 42-4, at 400-402, 427-428; Doc. 49, at 27, 36-37). Sexton notes that she had been working remotely successfully for over a year prior to her seizure and that Community Life Team had previously approved her for indefinite remote work during this time. (Doc. 42, at 22; Doc. 42-4, at 103-104, 226). Messick testified that while other account representatives failed to meet performance goals and were required to take part in an improvement plan, Sexton never needed to participate in an improvement plan. (Doc. 42-4, at 103-104). When asked if Sexton did not successfully complete any job duties while doing remote work in 2021, Messick replied, "she did her job." (Doc. 42-4, at 104, 226). Further, the record contains evidence that remote work would have been helpful to Sexton because it could have eliminated the need for her to commute, which was impossible due to her suspended license and inability to sit for long periods of time, allowed her more flexibility to recover from seizure complications, and permitted her to see her doctors more easily during the day. (Doc. 42-1, ¶ 50, Doc. 42-4, at 400-402, 427; Doc. 49, at 27). Accordingly, the Court

finds that Sexton has made a *prima facie* showing for purposes of surviving the motion for summary judgment that Community Life Team failed to accommodate her request to work remotely.

As Sexton has made a *prima facie* showing that Community Life Team failed to accommodate her request to work remotely, the burden shifts to Community Life Team to prove, as an affirmative defense, that "the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996). Community Life Team argues that remote work was an unreasonable accommodation because it would not have permitted Sexton to perform her essential job functions of doing billing work, which required in-person training as a prerequisite. (Doc. 38, at 19; Doc. 42-4, at 104); *see also* 29 C.F.R. § 1630, App. § 1630.9(a) ("[A]n accommodation made to assist an employee with a disability in the performance of his or her job must be adequate to enable the individual to perform the essential functions of the relevant position.").

The Court finds the facts in the record regarding the requirement for in-person training to be in dispute for two reasons. First, Sexton points to evidence in the record that disputes whether additional training needed to be done in-person. (Doc. 42-4, at 106, 119). The record reflects that the training process did not always require trainees to be in-person daily for at least three months, as Messick repeatedly told Sexton. (Doc. 42-4, at 107). For example, in a signed declaration, one employee, Ms. Gewertz, stated that she was required to be in-person for only two days of training. (Doc. 42-4, at 452). Messick confirmed this in her testimony. (Doc. 42-4, at 112). In Ms. Gewertz's declaration she expresses confusion as to why training could not be done remotely, noting that all training was electronic after two days. (Doc. 42-4, at 452). This at least creates a dispute as to the material fact of whether remote work would

have been reasonable if training could have been remote. Second, the undisputed record does not reflect that Sexton only performing quality assurance work on a temporary or part-time basis would be unduly costly. (Doc. 38; Doc. 49). Rather, Mr. Hernandez, a member of Community Life Team's management team, testified that Sexton performing only quality assurance work would "not have led to the significant improvement" in efficiency, as was intended by the change. (Doc. 42-4, at 157; Doc. 49, at 10). However, an accommodation need not help an employer significantly improve its efficiency. *See Williams*, 380 F.3d at 761 (holding that defendants seeking summary judgment on failure to accommodate claims must show that the sought and denied accommodation would cause an undue hardship). The test is whether the accommodation would be unduly costly. *Williams*, 380 F.3d at 761. In sum, there exists a genuine dispute as to whether remote work constituted a reasonable accommodation that would have enabled Sexton to perform her essential job functions. *See O'Donnell*, 790 F. Supp. 2d at 302 ("[I]n general, 'the question of whether a proposed accommodation is reasonable is a question of fact.'" (quoting *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 n. 4 (3d Cir. 2006))).

Community Life Team next submits that the ADA does not impose a duty on employers to offer a specific accommodation, in this case, remote work, just because an employee wants it. (Doc. 38, at 19). "[A]n employee cannot make h[er] employer provide a specific accommodation if another reasonable accommodation is instead provided...." *Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012) (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996)). Indeed, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for

it to provide." 29 C.F.R. § 1630, App. § 1630.9(a). Here, Community Life Team argues that they reasonably accommodated Sexton's disabilities by offering paid leave. (Doc. 38, at 19). This argument fails because the record is in dispute as to when Sexton could return to in-person work and her FMLA leave was expiring, making that accommodation potentially unavailable. (Doc. 42-4, at 324). As leave did not allow Sexton to perform essential functions of her position at all, whether Sexton's expiring FMLA leave, which Community Life Team offered to Sexton as an alternative to her remote work request, was a sufficient accomodation. *See Solomon*, 882 F. Supp. 2d at 780 (denying summary judgment where there was an issue of fact as to whether defendant's proffered alternative accommodations were sufficient to allow plaintiff to perform the essential functions of her position). The Court finds that a reasonable juror could conclude that the flexibility inherent to remote work, coupled with Sexton's previous success working remotely and Community Life Team's staggered training schedule for account representatives, would make it possible for Sexton to perform the essential functions of her position remotely.

For the forgoing reasons, Community Life Team's motion for summary judgment on Sexton's disability discrimination claims and failure to accommodate claims will be **DENIED**. (Doc. 37).

B.    Sᴇxᴛᴏɴ's PHRA Cʟᴀɪᴍs

Community Life Team next submits that it is entitled to summary judgment on Sexton's PHRA claims because she was not disabled, as defined by the PHRA. (Doc. 38, at 22). In opposition, Sexton argues that her seizure conditions and sciatica constitute a disability under the PHRA. (Doc. 42, at 23-24). Generally, the substantive elements of the ADA and PHRA causes of action are coextensive and therefore subject to the same analytical

evaluation. *See, e.g., Taylor,* 184 F.3d at 306 ("Before turning to the first issue, whether Taylor has a disability under the ADA, we mention that we will only discuss Taylor's ADA claim because our analysis of an ADA claim applies equally to a PHRA claim."); *see also Molyneaux v. Monroe Cty.*, No. CV 3:17-1865, 2020 WL 94079, at *5 n.3 (M.D. Pa. Jan. 8, 2020). Congress amended the ADA to broaden the definition of disability, and "[t]he Pennsylvania legislature has not amended the PHRA to similarly broaden the definition of 'disability[.]'" *Knapp v. Thompson Grp., Inc.*, No. 22-CV-03758-RAL, 2023 WL 8810785, at *7 (E.D. Pa. Dec. 19, 2023). Accordingly, "there appears to be some disagreement among federal and state courts in Pennsylvania as to whether the PHRA's definition of 'disability' remains coextensive with the new ADA definition. *Knapp*, 2023 WL 8810785, at *7. Therefore, the only issue here is whether the PHRA defines disability more narrowly than the ADA, because all other substantive elements of the ADA and PHRA claims are the same. *See Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 704 (E.D. Pa. 2015) ("At issue here is only that the PHRA defines 'disability' more narrowly than the ADAAA. The other elements of the PHRA are substantively identical to the ADAAA, so there is no need for separate analysis of those elements."). However, this Court does not need to determine if the PHRA and ADA definition of disability remain coextensive, as Plaintiff has a qualified disability under either standard.

Under the PHRA, a disability is defined in the same way as pre-amendment ADA claims, as "an actual mental or physical impairment that substantially limits one or more major life activities, a record of such impairment, or that his employer regarded him as having a disability." *Macfarlan v. Ivy Hill SNF, LLC,* 675 F.3d 266, 274 (3d Cir. 2012); *see also Sowell,* 139 F. Supp. 3d at 704 (defining PHRA disability in the same way the ADA defined disability

prior to amendment). District courts in the Third Circuit have held that "substantially limits" under the PHRA requires a showing that an individual is "'[u]nable to perform a major life activity that the average person in the general population can perform' or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.'" *Sowell*, 139 F. Supp. 3d at 704 (quoting *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 782–83 (3d Cir.1998)). Major life activities can include working. *Sowell*, 139 F. Supp. 3d at 705 (noting that when one is significantly limited in performing a job or class of jobs as compared to an average person, they are restricted in their ability to work). Temporary disability is not considered a disability under the PHRA. *Sowell*, 139 F. Supp. 3d at 705.

There is not a clear rule about whether a seizure condition qualifies as a disability under the PHRA. *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 443 (W.D. Pa. 2009) ("[t]here is no hard and fast rule with respect to whether an epileptic is substantially limited in major life activities."). Courts have considered the degree to which epilepsy or other seizure disorders impact an individual's major activities on a case-by-case basis. *Compare Rowles v. Automated Production Systems, Inc.*, 92 F. Supp. 2d 424 (M.D. Pa. 2000) (denying an employer's motion for summary judgment based upon an argument than epilepsy was not a disability because despite medication largely controlling seizures, the plaintiff still suffered from breakthrough seizures and he was limited in daily activities, including working, sleeping, and exposure to stress) *with Popko v. Pennsylvania State University*, 84 F. Supp. 2d 589 (M.D. Pa. 2000) (finding that a person did not have a disability when she had not suffered a seizure in

many years and the only impact of her seizures was that she occasionally woke up feeling shaky).

Here, Sexton suffered breakthrough seizures, despite birth control and other hormonal medication, with Sexton testifying that despite treatment, "every once in awhile I might have had [a seizure]." (Doc. 42-4, at 6). Sexton was unable to drive despite taking medication and was unable to stand or sit for long periods of time to deal with the sciatica that resulted in the aftermath of her devastating seizure. (Doc. 40-1, at 4; Doc. 42-1, at 12; Doc. 49, at 26-27). This Court finds these limitations in totality sufficient evidence to survive summary judgment. *See Rowles*, 92 F. Supp. 2d at 429 (M.D. Pa. 2000) (holding that a plaintiff's epilepsy was a disability when "[a]lthough [his physician] indicates that [p]laintiff's medication limits [p]laintiff's seizure activity, there is no indication that it *eliminates* [p]laintiff's risk of seizures altogether."). Accordingly, Community Life Team's motion for summary judgment on Sexton's PLRA claims is **DENIED**. (Doc. 37).

### C.   SEXTON'S RETALIATION CLAIMS

Finally, Community Life Team argues that it is entitled for summary judgment on Sexton's ADA and FMLA retaliation claims because (1) the timing of Sexton's termination is not suggestive of retaliation; (2) the record contains no evidence of that Community Life Team was hostile to Sexton related to her protected activities; and (3) even if Sexton could set forth a *prima facie* case of retaliation, evidence indicates a non-retaliatory reason for termination. (Doc. 38, at 24-26). Sexton maintains that there is evidence of causation and that

Community Life Team's allegedly legitimate reasons for terminating Plaintiff were pretextual. (Doc. 42, at 22-23).[4]

To establish a *prima facie* case of retaliation a plaintiff must demonstrate "(1) [a] protected employee activity; (2) [an] adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003). "Unlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA, but only that the plaintiff had a reasonable good faith belief that he was entitled to request the reasonable accommodation he requested." *Payne v. Woods Services, Inc.*, 520 F. Supp. 3d 670, 680 (E.D. Pa. 2021) (quoting *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010)). If the plaintiff can establish a *prima facie* case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). If the defendant meets this minimal burden, the plaintiff must point to evidence "that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 501 (3d Cir. 1997).

The parties dispute only the third and final element of a *prima facie* retaliation case: whether there is a causal connection between Sexton's protected activity and her termination.

---

[4] Community Life Team acknowledges that Sexton's invoking her right to FMLA leave and her request for accommodation are protected activities for the purposes of retaliation claims. (Doc. 38, at 25, 26); *see Shellenberger*, 318 F.3d at 191; *Sulima*, 602 F.3d at 188.

*Krouse,* 126 F.3d at 500. A causation analysis often, but not exclusively, rests on two key factors: "(1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period." *Jensen v. Potter,* 435 F.3d 444, 450 (3d Cir. 2006) (internal quotations omitted). "The Court measures temporal proximity from the date on which the litigant engaged in his first protect[ed] action." *Gairloch v. Pennsylvania State Univ.,* 84 F. Supp. 3d 407, 418 (M.D. Pa. 2015). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Jensen,* 435 F.3d at 450 (quoting *Krouse,* 126 F.3d at 503-04). In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference" of causation. *Straka v. Comcast Cable,* 897 F. Supp. 2d 346, 367 (W.D. Pa. 2012) (quotation omitted); *see also Farrell,* 206 F.3d at 280–81 ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference."). Regardless of the evidence a plaintiff relies on to establish causation, however, a plaintiff must also satisfy an initial gateway requirement by establishing that the defendant knew of the plaintiff's protected activity. *See Ambrose v. Township of Robinson, Pa.,* 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

Sexton's termination was effective on July 8, 2022. (Doc. 42-1, ¶¶ 73-74; Doc. 49, at 40-41). Earlier that day, Sexton spoke to representative at WorkPartners again requesting a

remote work accommodation and reported that Dr. Delp estimated that she could return to in-person work on September 30, 2022. (Doc. 42-1, ¶ 71; Doc. 49, at 40). Community Life Team argues that the temporal gap between her initial request for accommodations in April and her firing in July is not suggestive of causation. (Doc. 38, at 24); *see Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding temporal proximity not unduly suggestive where three weeks elapsed between the protected activity and the adverse employment action); *Kier v. F. Lackland & Sons, LLC*, No. CIV.A. 14–897, 2014 WL 7192403, at *17 (E.D. Pa. Dec. 17, 2014) ("Absent some intervening antagonism, Plaintiff cannot rest solely on a temporal proximity of more than one week."). However, in this situation, Sexto did not request an accommodation once. (Doc. 42-4). Instead, she repeatedly attempted to request remote work or an extension of her FMLA leave, with the most recent request for remote work occurring on the same day she was terminated. (Doc. 42-1, ¶¶ 73-74; Doc. 49, at 40-41). Her first request for an accommodation was not met with retaliation given the temporal gap, but Sexton establishes a question of material fact regarding the causal connection between her most recent accommodation request and firing. *Jensen*, 435 F.3d at 450 (finding that even if retaliation does not occur immediately after the protected activity, courts should look to other evidence that occurred in the intervening period between the adverse action and protected activity).

Next, the Court turns to whether Community Life Team has proffered a legitimate nondiscriminatory reason for Sexton termination. *See McDonnell Douglas*, 411 U.S. at 802. In its brief in support of this motion, Defendant reiterates that it had a legitimate reason for firing Sexton, namely that Sexton failed to report for in-person training necessary to perform billing work. (Doc. 38, at 16-17). However, as discussed *supra*, it is a question of fact whether an

accommodation for remote training would have allowed her to do billing work, as well as whether billing is an essential function of her job to begin with. The evidence in the record regarding the comments about Sexton's absence from work, including Messick's comment of "no words" also question whether the legitimate reason for her termination was pretextual. *Straka*, 897 F. Supp. 2d at 367 (noting that courts should consider the totality of circumstances including evidence of animus when analyzing whether an adverse action was retaliatory). Accordingly, Community Life Team's motion for summary judgment on Sexton's retaliation claims will be **DENIED**. (Doc. 37).

IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be **DENIED**. (Doc. 37).

An appropriate Order follows.

BY THE COURT:

Dated: September 26, 2024                    *s/ Karoline Mehalchick*
                                            **KAROLINE MEHALCHICK**
                                            **United States District Judge**